**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 11 |
| | ) | |
| SEMCRUDE, L.P., <u>et al.</u>, | ) | Case No. 08-11525 (BLS) |
| | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | |
| _____ | ) | |
| | ) | |
| ARROW OIL & GAS, INC., <u>et al.</u>, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Adversary No. 08-51444 (TEXAS) |
| | ) | |
| | ) | |
| SEMCRUDE, L.P., <u>et al.</u>, | ) | |
| | ) | |
| Defendants. | | |

**<u>OPINION</u>**[1]

Before the Court are a number of cross-motions for summary judgment on a complaint seeking declaratory relief. These include Plaintiffs' Motion for Summary Judgment on Phase I Issues [Docket No. 156], filed by certain Texas producers of oil and gas (the "Texas Producers"); Bank of America, N.A.'s Motion for Summary Judgment on the Threshold Questions of Law [Docket No. 161], filed by Bank of America, N.A., as administrative agent for the Debtors' pre-petition lenders (the "Banks"); J. Aron & Company's Consolidated Motion for Summary Judgment [Docket No.

---

[1] This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Federal Rule of Bankruptcy Procedure 7052.

149], filed by J. Aron & Company ("J. Aron"), an intervening party; and various joinders thereto as reflected on the docket in this adversary proceeding.

For the following reasons, the Court will grant in part the Motion of the Banks and deny the Motion of the Texas Producers.

## I.   PRELIMINARY STATEMENT

The key question before the Court in this declaratory judgment action is whether a security interest perfected only in Texas by virtue of the automatic perfection in Texas § 9.343 is subordinate to a security interest that was duly perfected against the Debtors in this case in accordance with Article 9's rules regarding perfection.  For the following reasons, the Court finds that, as a matter of law, such an automatically perfected security interest will be the junior security interest. Accordingly, summary judgment will be entered in favor of the Banks.

The Court recognizes that it is ruling today on issues of great significance to the parties both in economic terms and as a business reality.  There is little doubt that this ruling will be appealed.  In light of these considerations, the Court will certify this Opinion and Order pursuant to 28 U.S.C. § 158(d)(2)(A)(i) and (iii) for direct appeal to the United States Court of Appeals for the Third Circuit.

## II. **BACKGROUND**

A. General Background

On July 22, 2008 (the "Petition Date"), SemGroup, L.P. ("SemGroup"), and certain direct and indirect subsidiaries (collectively referred to hereinafter as the "Debtors") each filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code (the "Code"). Included among these entities are three companies that allegedly purchased oil and/or gas (the "Texas Product") from the Texas Producers: SemCrude, a limited partnership organized under the law of Delaware (Silverstein Aff., Ex. 6); Eaglwing, a limited partnership organized under the law of Oklahoma (Id. at Ex. 8); and SemGas, a limited partnership organized under the law of Oklahoma (Id. at Ex. 7). The Debtors' Chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure. The Debtors are authorized to continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Code.

On August 5, 2008, the Office of the United States Trustee (the "U.S. Trustee") appointed an Official Committee of Unsecured Creditors (the "Creditors Committee"). By Order dated October 15, 2008, the Court directed the U.S. Trustee to appoint and constitute a committee to represent the interests of producers of

3

oil and gas who sold product to the Debtors (the "Producers Committee")[Case No. 08-11525, Docket No. 1774]. Both the Creditors Committee and the Producers Committee have retained professionals and have actively participated in these cases.[2]

Founded in February 2000, the Debtors engage in a number of different businesses, each related to the energy industry. Included among the Debtors are several corporations which engage in the business of purchasing various forms of energy products, such as crude oil and natural gas, from producers and then subsequently reselling these products to refiners and other resellers in various types of sale and exchange transactions. Prior to the Petition Date, SemCrude, Eaglwing and SemGas, together with other Debtors, maintained a centralized cash management system in accounts at the Bank of Oklahoma. Cash collections by the Debtors were deposited into these accounts (Eaglwing, L.P. First Amended Schedules/Statements, Sch. B [Case No. 08-11525, Docket No. 1927]; SemCrude, L.P. First Amended Schedules/Statements, Sch. B [Case No. 08-11525, Docket No. 1926]; SemGas, L.P. First Amended Schedules/Statements, Sch. B [Case No. 08-11525, Docket No. 1936]).[3] The consolidated

_____

[2]    The Court notes that the Producers Committee is, by design, not a party to this litigation.

[3]    One of the Debtors, SemCrude, also maintained a bank account in Massachusetts with Bank of America, and a de minimis account with First State Bank in Dumas, Texas. The latter account had a balance of less than $5,000 on the Petition Date.

revenues of the Debtors during fiscal year 2007 were approximately $13.2 billion.

Historically, as part of their overall business strategy, the Debtors sought to establish a margin on their anticipated purchases of energy products by selling energy products for physical delivery to customers or by entering into future delivery obligations under futures contracts on the New York Mercantile Exchange ("NYMEX") and over-the-counter ("OTC") markets.  In the weeks leading up to the Petition Date, volatile energy prices increased the Debtors' margin requirements, causing a negative impact on the Debtors' liquidity positions. These cash flow problems were further exacerbated by catastrophic trading losses.  On July 16, 2008, the Debtors transferred their NYMEX trading account to Barclays Bank PLC, an action that converted loss contingencies into recognized losses that exceeded $2.4 billion.  These trading losses and increased margin requirements eventually prevented the Debtors from meeting their margin calls, and prompted their Chapter 11 filings.[4]

As of the Petition Date, the Banks asserted secured claims

---

(SemCrude, L.P. First Amended Schedules/Statements, Sch. B [Case No. 08-11525, Docket No. 1926]).

[4]     The events giving rise to these bankruptcy proceedings have been the subject of an extensive investigation by a Court-appointed examiner. (See Final Report of Louis J. Freeh, Bankruptcy Court Examiner, dated April 15, 2009 [Case No. 08-11525, Docket No. 3701]).  The Court's remarks in Section II are intended as background only.

5

against the Debtors and their affiliates (as either borrowers or guarantors) in the aggregate amount of approximately $2.55 billion.  Pursuant to their certain Amended and Restated Security Agreement, the Banks assert duly perfected security interests in substantially all of the Debtors property.[5]

B. <u>Factual Background Regarding the Oil and Gas Industry in Texas</u>

The parties to this litigation have expended significant time and effort in educating the Court as to the history and particulars of oil and gas ownership and production in Texas.[6] While the Court is ruling herein on a discrete question of law – the priority between competing security interests – it is both helpful and necessary to review this background in order to place this dispute in a proper framework.

Mineral rights may be severed from the fee simple absolute

---

[5]    The Debtors have stipulated to the extent, validity and priority of the Banks' security interests.  (<u>See</u> Final Order Under 11 U.S.C. §§ 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), and 364(e) and Fed. R. Bankr. P. 2002, 4001 and 9014 (I) Authorizing Debtors to Obtain Postpetition Financing, (II) Authorizing Debtors to Use Cash Collateral, and (III) Granting Adequate Protection to Prepetition Secured Parties, at ¶ 3 [Case No.  08-11525, Docket No. 1420]).  Pursuant to the Producer Claims Procedures Orders (defined and described <u>infra</u>), final determination of the validity of the Banks' liens is reserved for further proceedings.  At this stage, the parties seek a declaratory judgment regarding the relative priority of the Banks' security interests (assuming their validity for the moment) as against the rights of the Texas Producers under applicable state law.

[6]    The Court's knowledge of this industry is informed by expert reports and affidavits submitted by the parties in support of their respective summary judgment motions.

ownership of property and thus owned separately from the surface interest.  (Tex. Pls. Br., Ex. 5 at Ex. A, ¶ 10).  Before extraction, oil and gas are treated as real property.  (Tex. Bus. & Com. Code § 9.102 official cmt. ¶ 4(c)).  The term "as-extracted collateral" thus refers to oil, gas or other minerals that are subject to a security interest before extraction from the ground.  (See Del. Code tit. 6, § 9-301; Tex. Bus. & Com. Code § 9.102(a)(6)).  Upon extraction, minerals become personal property.  (Tex. Bus. & Com. Code § 9.102 official cmt. ¶ 4(c)).

Mineral owners rarely develop their minerals themselves. The technology and business of oil and gas exploration and development is complicated and expensive; few mineral owners possess the expertise or capital they need to act on their own. (Tex. Pls. Br., Ex. 5 at Ex. A ¶ 11).

Mineral owners typically transfer their mineral rights to an oil company through an oil and gas lease.  A fee simple owner or severed mineral owner who grants a lease is called a lessor.  A lessor typically receives a cash payment for granting the lease and retains a royalty, a percentage share of the oil and gas produced, or a percentage share of the value or revenues of production free of the costs of production. (Id. ¶ 13).

The person or oil company that receives a lease grant is called a lessee, and holds thereby the working interest, which

includes the right to search, drill for, develop, produce, and market from the leased land.  Often, a lessee will spread the cost of acquiring, evaluating, and exploring a lease by selling undivided percentages of the working interest to investors.  The owners of the working interest have the right to all of the oil and gas they produce from the land, other than that which goes to royalty owners, but must pay all costs of production.  (Id.).

Both mineral owners and lessees often create from their interests additional types of interests in favor of other parties.  These interests include "nonparticipating royalty" interests; "overriding royalty" interests and "carried" interests.  (Id. ¶ 14).

Operators/working interest owners must obtain permission to drill from certain state agencies that are charged with optimizing production of oil and gas.  They require drilling permits from the appropriate agency, and must comply with spacing rules designed to keep wells far enough apart to minimize the amount of drainage from one tract to another.  Typically, it is necessary to put together several leases to have enough acreage to form a spacing unit.  In addition, after wells have produced to the point that their production levels begin to decline, wells in several spacing units may be unitized, either voluntarily by their lessees, or by order of a state conversion agency, to maximize production from the formation.  Unitization refers to

the joint operation of all the leases and spacing units over a
producing formation, usually in conjunction with
enhanced-production techniques, which may substantially increase
the percentage of oil and gas that is ultimately recovered.  (Id.
¶ 16).

The lease owners in a spacing unit select one of their
number to act as the unit operator.  An operator is responsible
for day-to-day operation of the leases within a spacing unit.  To
facilitate decision-making, the operator and the other
working-interest owners in a spacing unit enter into an operating
agreement.  An operating agreement sets out the parties'
agreement with respect to the appointment of the operator, the
operators' rights and duties, initial drilling, further
development, the sharing of operations costs and revenues, the
marketing and sale of oil and gas, and accounting.  (Id. ¶ 17).
As a practical matter, an operating agreement is designed to set
forth a process by which the well is drilled and the production
is established, and to govern the operations of a productive well
after it has been established.  An operating agreement combines
or pools the leases and fractional interests of the parties for
operating purposes so that many leases are operated as if they
were one.  (Tex. Pls. Br., Ex. 5 at Ex. A ¶ 17).

Oil produced from a well by the operator is either
temporarily placed in storage tanks and then transported by

9

truck, or placed into a gathering line with other product to be delivered to a pipeline and transported.  Natural gas is always directed from the well through gathering lines into a pipeline. Transfer of title for either oil or gas may take place at a point of transfer on the spacing unit or at a market center or hub or at any place in between.  (Id. ¶ 20).

Typically, royalty owners do not take their oil and gas in kind; royalty owners either sell to the operator or the operator markets their shares.  The operators usually act on behalf of the interest owners and sell for the account of the other owners of legal interests in the oil and gas.  For example, Texas production was sold typically to Debtors by the operators of the Texas wells, as the party authorized to market and sell the production from the Texas wells.  Less frequently, purchasers contract directly with the owners of the oil and gas, but require that the unit operator accept payment on behalf of all the sellers in the unit and disburse the proceeds.  In either case, the purchaser of oil and gas usually pays the proceeds of sales to the unit operator, who in turn distributes the proceeds to the interest owner.  (Id. ¶¶ 22-23).

Those who disburse proceeds of oil and gas sales use division orders to protect themselves against claims that they have improperly paid to interest owners.  A division order is a statement executed by all parties who claim a legal interest in

10

the oil and gas and in the funds generated by its sale, agreeing
how the proceeds of oil and gas sales are to be distributed to
them.  Interest owners who sign division orders and receive
payments consistent with the division orders cannot later
complain that they were not paid properly.  (Id. ¶ 24).

In practice, as a result of severance of the mineral estate
from the surface estate and partial sales of the minerals, it is
not uncommon to find hundreds of royalty owners with interests in
a single well.  Thus, the task – typically reserved to operators
– of distributing proceeds to royalty owners is complex.  (Id. ¶¶
22-24).

The industry custom is that purchasers of oil and gas pay
amounts due to the owners on the 20th day of the month following
the delivery of oil and on the 25th day of the month following
delivery of gas.  (Id. ¶ 25).

C. Producer Claims

In the course of their business, several of the Debtors
(specifically, SemCrude, SemGas and Eaglwing) entered into
agreements with a large number of oil and gas producers located
in at least eight different states (collectively referred to
hereinafter as the "Oil and Gas Producers") to purchase oil and
gas.  The Texas Producers, a subgroup of the Oil and Gas
Producers, are generally owners of working interests in oil and
gas production from various wells located throughout Texas, and

many are operators of numerous wells pursuant to operating agreements with interest owners. As operators, the Texas Producers are authorized to market and sell oil and gas from the wells they operate, attributable to and for the benefit of their own working interests and for the benefit of non-operating interest owners and royalty interest owners. In addition, some of the Texas Producers own non-operating interests in numerous wells that are operated by other parties who sold production to the Debtors.

During the relevant period (from June 1 through July 21, 2008), the Texas Producers produced oil and gas from hundreds of wells situated in Texas that was purchased by the Debtors. As noted previously, under general terms between the parties, the Debtors were obligated to pay for the Texas Producers' production on July 20 and July 25, 2008, for June oil and gas sales, and on August 20 and 25, 2008, for July oil and gas sales.

Historically, the amounts owed on these contracts had been paid by the Debtors without incident in accordance with the above payment schedule. The Debtors' liquidity crisis and bankruptcy filings in the summer of 2008, however, changed this pattern. When the Debtors filed their Chapter 11 petitions on July 22, 2008, the Oil and Gas Producers, including the Texas Producers, had yet to receive payment for the oil and gas they had sold to the Debtors between June 1, 2008 and the Petition Date. The

12

parties are in agreement that the total production that the
Debtors purchased from wells located in Texas during the time
period discussed above and for which payment has not been made is
approximately $57 million.

The failure to pay the amounts owed on these contracts left
over a thousand Oil and Gas Producers, including many in Texas,
looking for payment and seeking to determine in this Court what
rights, if any, they had in the oil and gas they had sold to the
Debtors (or the proceeds from the Debtors' sale of such product)
between June 1 and the Petition Date under the laws of their
respective states.  Within the month following the Petition Date
alone, hundreds of reclamation demands were made upon the
Debtors.  Many separate adversary proceedings relating to these
reclamation demands or purported liens on the oil and gas in
question were commenced.  A number of emergency motions, seeking
either injunctive relief to prevent the sale or disposition of
the oil and gas in question or a lifting of the automatic stay to
proceed against it, also were filed in this Court within weeks of
the Petition Date.

D. Producer Claims Procedures Orders

In an attempt to prevent a multiplicity of actions and
preserve the resources of the Debtors and the Court, the Debtors
filed a motion for authorization to establish omnibus procedures
for, inter alia, the resolution of the rights and priorities of

the Oil and Gas Producers' claims pursuant to sections 105(a) and
362 of the Code and Rule 9019(a) of the Federal Rules of
Bankruptcy Procedure [Case No. 08-11525, Docket No. 600].
Following the filing of this motion, representatives of certain
Oil and Gas Producers met with representatives of the Debtors to
discuss the procedures that could be utilized in such a
structure.  Through these extensive negotiations, the Debtors and
the Oil and Gas Producers reached agreement on a set of
procedures that could be used to resolve these issues, and
presented this structure to the Court for approval on September
17, 2008.  The Court has entered  two orders (the "Producer
Claims Procedures Orders") adopting this proposed structure [Case
No.  08-11525, Docket Nos. 1425; 1557].

    The structure approved by the Court calls for the Oil and
Gas Producers to initiate one adversary proceeding against the
Debtors for each state in which the Oil and Gas Producers sold
oil or gas to the Debtors, a total of eight states.  The purpose
of these adversary proceedings is for the Oil and Gas Producers
to obtain a declaratory judgment establishing (i) what rights, if
any, are afforded by each respective state's law to a producer of
oil or natural gas who sells oil or natural gas to a first
purchaser, such as the Debtors here, and (ii) the priority of
these rights relative to the Banks' asserted security interests
in the Debtors' existing and after-acquired inventory.  All of

14

the Oil and Gas Producers were free to participate in this
litigation, and the Producer Claims Procedures Orders expressly
provided that the results of the litigation would be binding upon
the Oil and Gas Producers irrespective of whether they actively
participated in the process.

As may be apparent from the foregoing description, the
claims of the Texas Producers involve many individual
transactions aggregating over $57 million in value.  Accordingly,
the actual calculation and allowance of individual Texas
Producers' claims is not presently before the Court.  Likewise,
the determination of the extent, validity and priority of the
Banks' security interests is not presently before the Court (but
is reserved for further proceedings), such that for purposes of
this Opinion, the Court and the parties are presuming the
validity and perfection of these asserted security interests.

In the present case, the Court will determine the rights,
status, and relative priority of the interests of the Texas
Producers in the crude oil and natural gas they sold to the
Debtors between June 1, 2008 and July 22, 2008 and the proceeds
thereof.

This matter has been fully briefed.  The Court has conducted
two full days of oral argument on these and related motions in
May, 2009.  It is ripe for decision.

## II. <u>JURISDICTION AND VENUE</u>

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(a) and (b)(1).  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  Consideration of this adversary proceeding constitutes a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), (K), and (O).

## III. <u>STANDARD OF REVIEW</u>

The parties have filed cross-motions for summary judgment on the Texas Producers' claim for declaratory relief.  The Court notes that "the standards under which to grant or deny summary judgment do not change because cross-motions are filed."  <u>In re U.S. Wireless Corp., Inc.</u>, 386 B.R. 556, 560 (Bankr. D. Del. 2008).

Summary judgment is only appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Fed. R. Bankr. P. 7056.  In doing so, the Court must view all facts and any reasonable inferences that might be drawn from them in the light most favorable to the nonmoving party.  <u>In re Elrod Holdings Corp.</u>, 394 B.R. 760, 763 (Bankr. D. Del. 2008).

In order to avoid summary judgment, the nonmoving party

16

must come forward with specific facts showing that there is a
genuine issue for trial.  U.S. Wireless, 386 B.R. at 559.  An
issue of material fact is genuine if the factfinder could return
a judgment for the nonmoving party on the disputed issue.  Elrod
Holdings, 394 B.R. at 763.  If the nonmoving party fails to
present facts establishing a genuine issue for trial, the moving
party is entitled to summary judgment.  Thus, the Court must ask:
"(1) is there no genuine issue of material fact and (2) is one
party entitled to judgment as a matter of law?"  Gray v. York
Newspapers, Inc., 957 F.2d 1070, 1078 (3rd Cir. 1992) (quoting
Country Floors, Inc. v. Gepner, 930 F.2d 1056, 1060 (3d Cir.
1991)).

In this case the underlying claim on which both sides seek
summary judgment is one for declaratory relief.  It is well-
settled that declaratory relief is available "to settle actual
controversies before they ripen into violations of a law or a
breach of duty."  United States v. Fisher-Otis Co., 496 F.2d
1146, 1151 (10th Cir. 1974); see Step-Saver Data Sys., Inc. v.
Wyse Tech., 912 F.2d 643, 647 (3d Cir. 1990).  Such relief is
appropriate where "there is a substantial controversy, between
parties having adverse legal interests, of sufficient immediacy
and reality."  Armstrong World Indus., Inc. by Wolfson v. Adams,
961 F.2d 405, 411 (3d Cir. 1992) (quoting Md. Cas. Co. v. Pacific
Coal & Oil Co., 312 U.S. 270, 273, 61 S.Ct. 510, 85 L.Ed. 826

17

(1941)).

## IV. <u>DISCUSSION</u>

Presently before the Court are cross-motions for summary judgment on a complaint seeking declaratory relief.  As detailed at length below, the parties dispute not only which state law or laws govern this dispute, but also the application of those respective laws.

A. <u>The Parties' Positions</u>

The Texas Producers assert in their motion for summary judgment that, pursuant to § 9.343 of the Texas Business & Commerce Code ("Texas § 9.343"), they are the holders of automatically-perfected purchase money security interests ("PMSIs") in all Texas Product sold to the Debtors and any resulting proceeds held by the Debtors.  As such, the Texas Producers contend that their rights are prior to the Banks' security interest.

The Banks contend that perfection of the security interests claimed by the Texas Producers pursuant to Texas § 9.343 are governed by either Delaware or Oklahoma law, depending upon the relevant Debtor and its place of incorporation pursuant to the choice-of-law provisions in Article 9 of the UCC.  These provisions were adopted uniformly by each state (including Texas) at issue in this adversary proceeding.  To the extent that the

18

Texas Producers did not perfect their Texas § 9.343 security interests in either Oklahoma or Delaware before the Petition Date, the Banks contend that the Texas Producers possess unperfected security interests subordinate to the security interest of the Banks.

In the alternative, the Banks assert that even if Texas law governs perfection of the Texas Producers' security interests, Texas law limits the Texas Producers' special PMSI priority arising pursuant to Texas § 9.343 to (i) the remaining oil and gas inventory of the Debtors as of July 22, 2008, the day the Debtors filed bankruptcy, and (ii) any proceeds from the sale of such oil and gas that the Debtors received on or before delivery of the Texas Product.  The relative priority of any security interests not falling into either of these two categories, the Banks argue, is instead governed by the "first to file or perfect" rule found in Texas § 9.322.

B. <u>Analysis</u>

The Court finds summary judgment appropriate in this case because the parties are seeking declaratory relief regarding purely legal questions.  Consequently, as described at length below, there is no genuine issue of material fact that precludes the granting of summary judgment.

In addressing the dispute before it, the Court is faced with choice of law questions involving security interests.  Given the

19

uniformity found in most states' versions of Article 9 of the UCC, choice of law issues regarding security interests are rarely litigated.  Because Texas § 9.343 is a non-uniform amendment to Texas' version of the UCC, however, the Court's resolution of the instant summary judgment motions will differ significantly based on what state law(s) govern perfection of the Texas Producers' purported security interests, as well as what state law(s) govern the effect of that perfection or nonperfection, and the priority among multiple perfected security interests.  An overview of each relevant states' respective law follows.

## 1. Texas law

As a preliminary matter, the Court notes that many parts of Texas § 9.343 have yet to be interpreted by any court, much less by the Texas Supreme Court.  As such, the Court is obliged to predict state law.  See generally Packard v. Provident Nat. Bank, 994 F.2d 1039, 1049 (3d Cir. 1993) (discussing the role of a federal court when predicting state law).  When a federal court sets out to predict state law, it sits, in effect, as a state supreme court.  Commissioner v. Estate of Bosch, 387 U.S. 456, 465, 87 S.Ct. 1776, 1783, 18 L.Ed.2d 886 (1967).  The decisions of that state's own lower courts must therefore be researched thoroughly and given great weight, at least in the absence of convincing evidence showing that the state supreme court would not follow them.  See Fidelity Union Trust Co. v. Field, 311 U.S.

20

169, 177-78, 61 S.Ct. 176, 178, 85 L.Ed. 109 (1940).

In so doing, this Court employs Texas' rules of statutory construction, as set forth recently by the Texas Supreme Court in City of Rockwall v. Hughes, 246 S.W.3d 621, 625-26 (Tex. 2008). In Texas, a court tasked with construing statutes should ascertain and give effect to the legislature's intent as expressed by the language of the statute. Id. at 625 (citing State, Texas Parks and Wildlife Dept. v. Shumake, 199 S.W.3d 279, 284 (Tex. 2006)). The courts also must use definitions prescribed by the legislature and any technical or particular meaning the words have acquired. Id. (citing Tex. Gov't Code § 311.011(b)). Otherwise, Texas courts "construe the statute's words according to their plain and common meaning," id. (citing Texas Dept. of Transp. v. City of Sunset Valley, 146 S.W.3d 637, 642 (Tex.2004)), unless a contrary intention is apparent from the context, id. at 625-26 (citing Taylor v. Firemen's and Policemen's Civil Service Commission of City of Lubbock, 616 S.W.2d 187, 189 (Tex. 1981)), or unless such a construction leads to absurd results. Id. at 626 (citing Univ. of Tex. S.W. Med. Ctr. v. Loutzenhiser, 140 S.W.3d 351, 356 (Tex. 2004)). Moreover, Texas courts "presume the legislature intended a just and reasonable result by enacting a statute." Id. (citing Tex. Gov't Code § 311.021(3)). "When a statute's language is clear and unambiguous, it is inappropriate to resort to rules of

construction or extrinsic aids to construe the language." <u>Id.</u>
(collecting cases).  Texas courts, however, "may also consider
legislative history in construing a statute that is not
ambiguous." <u>Id.</u> (citing Tex. Gov't Code § 311.023(3)).

   a. <u>Perfection and covered collateral</u>

   As noted above, the Texas Legislature enacted Texas § 9.343
as a non-uniform amendment to Texas' version of the Uniform
Commercial Code, known as the Texas Business and Commerce Code.
Subsection (a) of Texas § 9.343 provides for the creation of a
security interest in favor of all interest owners:

> This section provides a security interest in
> favor of interest owners, as secured parties,
> to secure the obligations of the first
> purchaser of oil and gas production, as
> debtor, to pay the purchase price.  An
> authenticated record giving the interest
> owner a right under real property law
> operates as a security agreement created
> under this chapter.  The act of the first
> purchaser in signing an agreement to purchase
> oil or gas production, in issuing a division
> order, or in making any other voluntary
> communication to the interest owner or any
> governmental agency recognizing the interest
> owner's right operates as an authentication
> of a security agreement in accordance with
> Section 9.203(b) for purposes of this
> chapter.

Tex. Bus. & Comm. Code § 9.343(a).

   The term "interest owner" is defined as "a person owning an
entire or fractional interest of any kind or nature in oil or gas
production at the time of severance, or a person who has an

22

express, implied, or constructive right to receive a monetary payment determined by the value of oil or gas production or by the amount of production." Id. at § 9.343(r)(2). Courts construe the term "interest owner" broadly. See generally In re Tri-Union Dev. Corp., 253 B.R. 808, 812-13 (Bankr. S.D. Tex. 2000).

A "first purchaser," meanwhile, is defined as "the first person that purchases oil or gas production from an operator or interest owner after the production is severed, or an operator that receives production proceeds from a third-party purchaser who acts in good faith under a division order or other agreement authenticated by the operator under which the operator collects proceeds of production on behalf of other interest owners." Tex. Bus. & Comm. Code § 9.343(r)(3). An "operator" is "a person engaged in the business of severing oil or gas production from the ground, whether for the person alone, only for other persons, or for the person and others." Id. at § 9.343(r)(4).

Numerous documents are sufficient to "trigger the security agreement authentication." In re Aurora Nat'l Gas, LLC, 312 B.R. 318, 324 (Bankr. N.D. Tex. 2004). In addition to an express agreement and a division order, the statute allows for the creation of a security interest based upon "any other voluntary communication" from the operator or first purchaser to the interest owner or any governmental agency. Tex. Bus. & Comm.

23

Code § 9.343(a).

The security interest provided by Texas § 9.343(a) is
perfected automatically without the filing of an actual financing
statement.  <u>Id.</u> at § 9.343(b).  This automatic perfection is made
possible because, <u>inter alia</u>, subsection (b) provides that:

> If the interest of the secured party is
> evidenced by a deed, mineral deed,
> reservation in either, oil or gas lease,
> assignment, or any other such record recorded
> in the real property records of a county
> clerk, that record is effective as a filed
> financing statement for purposes of [Article
> 9], but no fee is required except a fee that
> is otherwise required by the county clerk,
> and there is no requirement of refiling every
> five years to maintain effectiveness of the
> filing.

<u>Id.</u>

Thus, a perfected security interest arising under Texas §
9.343 does not require an actual written security agreement or
the filing of an actual financing statement; rather, the
perfected security interest arises upon: "1) a writing which
gives the interest holder a right under real estate law (i.e., a
deed, oil and gas lease, mineral assignment, etc.); and 2) the
act of the first purchaser making a voluntary communication to
the interest owner acknowledging his or her rights to the oil
and/or gas property or its proceeds."  <u>Tri-Union</u>, 253 B.R. at
811.

The security interests created by Texas § 9.343 encumber:

24

(i) oil and gas production in the possession of the first purchaser, and (ii) proceeds thereof received by or due to the first purchaser. <u>See</u> Tex. Bus. & Comm. Code § 9.343(c). There is no requirement that an interest owner must trace specific production or dollars from the sale of the production in order to have a security interest in proceeds. <u>Aurora Nat'l Gas</u>, 312 B.R. at 331-32.

These security interests exist "for an unlimited time" if:

> (A) the proceeds are oil or gas production,
> inventory of raw, refined, or manufactured
> oil or gas production, or rights to or
> products of any of those, although the sale
> of those proceeds by a first purchaser to a
> buyer in the ordinary course of business as
> provided in Subsection (e) cuts off the
> security interest in those proceeds;
>
> (B) the proceeds are accounts, chattel paper,
> instruments, documents, or payment
> intangibles; or
>
> (C) the proceeds are cash proceeds, as
> defined in § 9.102.

Tex. Bus. & Comm. Code § 9.343(c)(1)(A), (B), and (C). Section 9.102(a)(9) defines "cash proceeds" as "proceeds that are money, checks, deposit accounts, or the like." <u>Id.</u> at § 9.102(a)(9). Otherwise the security interest exists "for the length of time provided in Section 9.315 for all other proceeds." <u>Id.</u> at § 9.343(c)(2). Texas § 9.343 recognizes the historic practice of allowing full payment from a buyer in the ordinary course to

25

ultimately discharge the interest owner's security interest, however.  See id. at § 9.343(e).

Moreover, Texas § 9.343 provides that a security interest created by the statute "remains effective against the debtor and perfected against the debtor's creditors even if assigned, regardless of whether the assignment is perfected against the assignor's creditors.  If a deed, mineral deed, assignment of oil and gas lease, or other such record evidencing the assignment is filed in the real property records of the county, it will have the same effect as filing an amended financing statement under Section 9.514."  Id. at § 9.343(j).

In addition to, and not to be confused with the interest owners' security interests in oil and gas and resulting proceeds, Texas § 9.343 provides for the creation of a statutory lien to "secure[] the payment of all taxes that are or should be withheld or paid by the first purchaser" and to "secure[] the rights of any person who would be entitled to a security interest under Subsection (a) except for lack of any adoption of a security agreement by the first purchaser or a lack of possession or record required by Section 9.203 for the security interest to be enforceable."  Id. at § 9.343(d).[7]

---

[7]    The question of the Texas Producers' rights with respect to the statutory lien provided by Texas § 9.343 is not at issue in this adversary proceeding.

b. <u>Priority</u>

Subsection (f)(1) of Texas § 9.343 provides that "[a] security interest created by this section is treated as a purchase-money security interest for purposes of determining its relative priority under Section 9.324 over other security interests not provided for by this section." <u>Id.</u> at § 9.343(f)(1).  The section referred to therein, Texas § 9.324, is the Texas Business and Commerce Code's section governing priority of purchase money security interests.

Of particular importance to the instant dispute are the provisions of Texas § 9.324(a) and (b):

(a)  Except as otherwise provided in Subsection (g), a perfected purchase-money security interest in goods other than inventory or livestock has priority over a conflicting security interest in the same goods, and, except as otherwise provided in Section 9.327, a perfected security interest in its identifiable proceeds also has priority, if the purchase-money security interest is perfected when the debtor receives possession of the collateral or within 20 days thereafter.

(b)  Subject to Subsection (c) and except as otherwise provided in Subsection (g), a perfected purchase-money security interest in inventory has priority over a conflicting security interest in the same inventory, has priority over a conflicting security interest in chattel paper or an instrument constituting proceeds of the inventory and in proceeds of the chattel paper, if so provided in Section 9.330, and, except

as otherwise provided in Section 9.327, also has priority in identifiable cash proceeds of the inventory to the extent the identifiable cash proceeds are received on or before the delivery of the inventory to a buyer, if:

(1)   the purchase-money security interest is perfected when the debtor receives possession of the inventory;

(2)   except where excused by Section 9.343 (oil and gas production), the purchase-money secured party sends an authenticated notification to the holder of the conflicting security interest;

(3)   the holder of the conflicting security interest receives any required notification within five years before the debtor receives possession of the inventory; and

(4)   the notification states that the person sending the notification has or expects to acquire a purchase-money security interest in inventory of the debtor and describes the inventory.

Id. at § 9.324(a),(b).

The parties vigorously dispute just how Texas § 9.343(f)(1) interacts with Texas § 9.324, particularly § 9.324(b).  The parties all acknowledge that Texas § 9.343(p) provides that "[t]he rights of any person claiming under a security interest or lien created by this section are governed by the other provisions of [Texas' version of Article 9] except to the extent that this

28

section necessarily displaces those provisions."   But the
parties disagree regarding the question of whether Texas § 9.343,
including but not limited to subsection (f)(1), necessarily
displaces Texas § 9.324.   The Texas Producers argue that it does.
The Banks argue that it does not.

The Banks argue that Texas § 9.343(f)(1)'s language
dictating that the security interest created by Texas § 9.343(a)
"is treated as a purchase-money security interest for purposes of
determining its relative priority under Section 9.324" means just
what it says.   That is, the Banks contend that the PMSI priority
created by Texas § 9.343(f)(1) is no more or less broad than any
other PMSI in inventory would be, and is thus subject to the same
cutoff rules as all other PMSIs in inventory.   This is the case,
they contend, because nothing in any part of Texas § 9.343
expressly provides otherwise.   Consequently, the general rules
regarding PMSIs in Texas § 9.324 are not displaced by Texas §
9.343, and, as per Texas § 9.343(p), the general rules therefore
govern the terms of the PMSI created by Texas § 9.343(f)(1).

By contrast, the Texas Producers argue that Texas § 9.343
was intended to be, and is, a self-contained statutory provision
that completely governs the rights of interest owners with
respect to the security interests provided therein in oil and gas
and resulting proceeds.   In support of this argument, the Texas
Producers cite examples of other provisions of Texas § 9.343 –

29

distinct from subsection (f)(1) – contradicting other provisions
of Texas' Article 9.

The Texas Producers also argue that Texas § 9.324 is
directly displaced by Texas § 9.343(c), when read in conjunction
with Texas § 9.343(a).  Texas § 9.343(c) provides that the
security interest granted to the Texas Producers by the remainder
of Texas § 9.343

> exists in oil and gas production, and also in
> the identifiable proceeds of that production
> owned by, received by, or due to the first
> purchaser:
>
> (1) for an unlimited time if:
>
> (A) the proceeds are oil or gas
> production, inventory of raw,
> refined, or manufactured oil
> or gas production, or rights
> to or products of any of
> those, although the sale of
> those proceeds by a first
> purchaser to a buyer in the
> ordinary course of business as
> provided in Subsection (e)
> cuts off the security interest
> in those proceeds;
>
> (B) the proceeds are accounts, chattel
> paper, instruments, documents, or
> payment intangibles; or
>
> (C) the proceeds are cash proceeds, as
> defined in Section 9.102.[8]

---

[8]    Texas § 9.102(a)(9) defines "cash proceeds" as
"proceeds that are money, checks, deposit accounts, or the like."
Tex Bus. & Comm. Code § 9.102(a)(9).

Id. at § 9.343(c)(1).  Along a similar vein, the Texas Producers note that Texas § 9.343(e) provides that the Texas Producers' security interests "continue in the proceeds of the sale by the first purchaser as provided in Subsection (c)."  Id. at § 9.343(e).

Finally, the Texas Producers argue that the operation of the oil and gas industry supports construing those entitled to PMSI priority under the Texas statute broadly.  Put simply, they contend that, as a practical matter, the oil and gas industry works in such a manner that PMSI priority would, under Texas § 9.324(b), always be limited to inventory still in the hands of a first purchaser (or, in the case of bankruptcy, inventory still in the hands of a first purchaser on the day the bankruptcy petition is filed).  The Texas Legislature, they argue, must have intended for the PMSI priority to extend more broadly.[9]

The Court adopts the Banks' reading based on the plain language of Texas § 9.343.  In so doing, the Court holds that the general rules regarding PMSIs in Texas § 9.324 are not displaced by Texas § 9.343 and therefore serve to govern Texas § 9.343.

To embrace the Texas Producers' argument that Texas § 9.343

---

[9]     The Texas Producers do make one other argument in which they discuss Texas § 9.324(g), which governs priority between competing PMSIs in the same collateral.  Because the Banks do not have or assert PMSI security interests, however, the Court need not address this argument.

31

is a self-contained statutory provision would essentially read Texas § 9.343(p)'s directive regarding when the section is governed by other Article 9 provisions out of the statute. Moreover, the Texas Producers' examples where other parts of Texas § 9.343, which are unrelated to Texas § 9.324's language regarding PMSI priority, displace other sections of Texas' version of Article 9 are irrelevant to the issue of whether Texas § 9.324 is displaced by Texas § 9.343.  Displacement of Article 9 by Texas § 9.343 is not an all-or-nothing proposition; Texas § 9.343 can displace some sections, but not others.

What is relevant is whether specific language in Texas § 9.343 necessarily displaces Texas § 9.324's rules regarding PMSI priority, and the only language offered by the Texas Producers is insufficient to support the proposition.  The Texas Producers argue that when Texas § 9.343(a), (c), and (f) are read together, they state that the security interest "provided by this section" shall be "treated as a purchase-money security interest" in dealing with other security interests not provided by § 9.343, and shall continue "for an unlimited time" in most forms of proceeds.  The main problem with this reading, however, is that it overlooks exactly what it is that continues for an unlimited time: the Texas Producers' security interest, not the Texas Producers' PMSI priority.  Had the Texas Legislature wanted the Texas Producers' PMSI to continue for an unlimited time, it could

32

have expressly stated as much, but it did not.  Instead, it gave
the Texas Producers a security interest that continues for an
unlimited time in most forms of proceeds, and it provided that
this security interest is "treated as" a PMSI.  To see what type
of priority a PMSI enjoys under Texas law (and to what collateral
it attaches), however, the Court must look to Texas § 9.324,
including Texas § 9.324(b) in the case of inventory.  Otherwise,
the Court would be at a loss for how to treat the Texas
Producers' security interests as PMSIs.

The Court's reading is also supported by the Official
Comment to Texas § 9.343, which was formally adopted by the Texas
Legislature when it enacted the statute:

> It is fair to give these interest holders and
> non-tax statutory liens the <u>same priority</u> in
> the inventory produced that they would have
> if they went through all the motions required
> to get the best rights they can under Article
> 9, i.e., a purchase money security interest
> in [1] inventory, in [2] the oil and gas
> accounts mentioned in § 9.103(e) [now §
> 9.102(a)(6)] of Article 9, and [3] in those
> proceeds which they would think of taking an
> interest in.  <u>This section gives them these
> rights without making them go through the
> motions</u>....

<u>Id.</u> at § 9.343 official cmt. ¶ 5 (emphasis added).  This Official
Comment, which has been cited by both the Banks and the Texas
Producers in their pleadings, makes clear that the Texas
Legislature intended to give the Texas Producers the "same
priority" that a PMSI would otherwise have under Article 9, and

33

simply wished to give them these rights without making them go through the normal procedures otherwise required to obtain a PMSI. This "same priority," of course, is that which is contained in the remainder of Texas' version of Article 9, including Texas § 9.324(b).

Thus, the Court holds that, pursuant to Texas § 9.324(b), the Texas Producer's PMSI priority is limited to inventory on hand at the time the Debtors filed bankruptcy, any identifiable cash proceeds that the Debtors received prior to delivery of the oil and gas production to the subsequent purchaser, and certain chattel paper. Id. at § 9.324(b).

But the Texas Producers who meet the requirements set forth in Texas § 9.343 will still be granted a security interest if Texas law governs perfection in this adversary proceeding, even if they do not qualify for PMSI priority, and these security interests could prove valuable. As noted above, subsection (a) of Texas § 9.343 provides for the creation of a security interest in favor of all interest owners and provides that "[a]n authenticated record giving the interest owner a right under real property law operates as a security agreement created under [Article 9]." Id. at § 9.343(a). Subsection (b) of Texas § 9.343, meanwhile, provides for automatic perfection of this security interest and, more importantly, commands that:

> If the interest of the secured party is

34

> evidenced by a deed, mineral deed,
> reservation in either, oil or gas lease,
> assignment, or any other such record recorded
> in the real property records of a county
> clerk, that record is <u>effective as a filed
> financing statement</u> for purposes of [Article
> 9], but no fee is required except a fee that
> is otherwise required by the county clerk,
> and there is no requirement of refiling every
> five years to maintain effectiveness of the
> filing.

<u>Id.</u> at § 9.343(b) (emphasis added).  Moreover, Texas § 9.343

provides that a security interest created by the statute "remains

effective against the debtor and perfected against the debtor's

creditors even if assigned, regardless of whether the assignment

is perfected against the assignor's creditors."  <u>Id.</u> at §

9.343(j).  If a deed, mineral deed, assignment of oil and gas

lease, or similar record evidencing the assignment is filed in

the real property records of the county, it will have the same

effect as filing an amended financing statement under Texas §

9.514.  <u>Id.</u>

Section § 9.322 of Texas' version of Article 9 provides

that "[c]onflicting perfected security interests ... rank

according to priority in time of filing or perfection.  Priority

dates from the earlier of the time of a filing covering the

collateral is first made or the security interest ... is first

perfected."  <u>Id.</u> at § 9.322(a)(1).  For purposes of subsection

(a)(1), "the time of filing or perfection as to a security

interest in collateral is also the time of filing or perfection as to a security interest in proceeds." Id. at § 9.322(b)(1).

In practice, any such deeds, mineral deeds, reservations in either, oil or gas leases, assignments, or other such applicable records may have been recorded by the Texas Producers in the applicable county clerk's office before the Banks' financing statement was filed. Accordingly, under the "first to file or perfect" rule, the Texas Producers' security interests in collateral such as oil and gas production, accounts, cash, exchanged oil and gas, and the like, which extend for an unlimited time pursuant to § 9.343(c), would take priority under Texas law over the Banks' competing Article 9 security interest in the same collateral to the extent that such records benefiting the Texas Producers were filed prior to the Banks' financing statements covering the same collateral.

To the extent that creditors possess unperfected security interests, however, they will be subordinate to a perfected security interest in the same collateral under Texas' Article 9 priority rules. This is because Texas § 9.322(a)(2) provides that "[a] perfected security interest or agricultural lien has priority over a conflicting unperfected security interest or agricultural lien."

**2. Delaware law**

Delaware's version of Article 9 applies to, <u>inter alia</u>, "a transaction, regardless of its form, that creates a security interest in personal property or fixtures by contract." 6 Del. C. § 9-109. In this regard, the scope of Delaware's Article 9 is identical to Texas § 9.109, and 12A Okl. St. Ann. § 1-9-109.

As noted above, Texas § 9.343 is a non-uniform amendment to Texas' version of Article 9 of the UCC. Delaware's version of Article 9 does not contain a similar provision providing for automatic perfection of a security interest to producers of oil and gas. Instead, oil and gas producers seeking to perfect a security interest under Delaware law are left to do so via Article 9's traditional methods of perfection. These include filing a financing statement, taking possession of the collateral, and, when appropriate, obtaining "control" over the collateral.

To the extent that Delaware law governs perfection and certain creditors, such as the Texas Producers, fail to perfect security interests before the relevant debtor files bankruptcy, these creditors will be subordinate to a creditor who has a perfected security interest in the collateral in question under Delaware's Article 9 priority rules. <u>See</u> <u>id.</u> at § 9-322(a)(2).

**3. Oklahoma law**

Like Delaware's version of Article 9, Oklahoma's UCC does

37

not contain a provision similar to Texas § 9.343.[10]  Thus,
producers of oil and gas who wish to perfect an Article 9
security interest under Oklahoma law must either file a financing
statement in Oklahoma, take possession of the collateral in
question, where allowed, or obtain control over the collateral in
question, again where allowed, in order to do so.  To the extent
producers fail to properly perfect their security interest via
one of these methods, any security interest they possess will be
unperfected under Oklahoma law.  Just as in Delaware and Texas,
an unperfected security interest will be subordinate to a
perfected security interest under Oklahoma's Article 9 priority
rules.  See 12A Okl.St.Ann. § 1-9-322.

**4. Choice of Law**

The issues before this Court with respect to the claims of
the Texas Producers are: (i) whether, under applicable choice of
law principles, Texas law governs the perfection and/or priority
of the Texas Producers' claimed security interests; and (ii) if
Texas law applies and if the Texas Producers have automatically
perfected security interests thereunder, whether and to what
extent the Texas Production and the proceeds thereof have

---

[10]    Oklahoma does have a lien statute that serves a similar
purpose, but these liens are separate and distinct from Article 9
security interests, as well as subordinate to perfected security
interests under Oklahoma law.  See Arkla Exploration Co. v.
Norwest Bank of Minneapolis, 948 F.2d 656, 660 (10th Cir. 1991).

priority over the competing Article 9 security interests of the Banks.

        a. Governing law of perfection

    "When two states have a connection to a case and an issue arises on which the states' respective laws differ, a choice of law must be made."  PHP Liquidating, LLC v. Robbins (In re PHP Healthcare Corp.), 128 Fed. Appx. 839, 843 (3d Cir. 2005).  See also Huber v. Taylor, 469 F.3d 67, 74, 76 (3d Cir. 2006) (where there is "a true conflict between ... potentially applicable bodies of law" it is necessary "to examine the law of all the relevant jurisdictions") (emphasis in original).  Here, Texas § 9.343 is a non-uniform amendment to the UCC, which differs from the standard UCC rules regarding the perfection and priority of security interests.  Accordingly, this Court must determine which states' laws govern (i) perfection of the Texas Producers' alleged security interests in the Texas Product and the proceeds thereof and (ii) whether the Texas Producers' claimed security interests in the Debtors' assets have priority over the Bank's conflicting security interest in the same assets.  The fact that Texas enacted non-uniform provisions of the UCC concerning Texas oil and gas does not end the inquiry as to whether the security interests claimed by the Texas Producers have priority over the competing security interests of the Banks in assets of the relevant Debtors – a Delaware entity and two Oklahoma entities.

39

In the absence of a specific federal policy or interest dictating the use of federal choice of law rules, it is well settled in this Circuit that a bankruptcy court faced with the issue of which substantive state law to apply to a claim for relief in an adversary proceeding applies the choice of law rules of the forum state.  PHP Liquidating, 128 Fed. Appx. at 843 (3d Cir. 2005); Robeson Indus. Corp. v. Hartford Accident & Indemn. Co., 178 F.3d 160, 164-65 (3d Cir. 1999); Charan Trading Corp. v. Uni-Marts, LLC (In re Uni-Marts, LLC), 399 B.R. 400, 414 n.4 (Bankr. D. Del. 2009); Pickett v. Integrated Health Servs., Inc. (In re Integrated Health Services, Inc.),  304 B.R. 101, 106 (Bankr. D. Del. 2004), aff'd, 233 Fed. Appx. 115, 118 n.2 (3d Cir. 2007).  Because Klaxon v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941), "make[s] clear that federal law may not be applied to questions which arise in federal court but whose determination is not a matter of federal law," In re Merritt Dredging Co., 839 F.2d 203, 206 (4th Cir. 1988), state choice of law rules must be applied in adversary proceedings in bankruptcy court.

The Texas Producers argue that in deciding the choice of law question here, this Court should not apply Delaware's choice of law rules and should instead assess which state has the "most significant contacts and relationships."  (Tex. Pls. Opp. Br. at p. 20).  However, while Vanston Bondholders Protective Comm. v.

_Green_, 329 U.S. 156 (1946), upon which Plaintiffs rely, "contains some broad statements that may be read to suggest that bankruptcy courts should not adopt the choice of law rules of the forum state," the Court did not hold that federal choice of law rules apply to state law claims in adversary proceedings in bankruptcy courts.  _Bianco v. Erkins (In re Gaston & Snow)_, 243 F.3d 599, 606-07 (2d Cir. 2001).  Thus, the holding in _Vanston_ does not conflict with the Bank's position here that the forum's choice of law principles apply.

In sum, applicable Third Circuit precedent makes clear that Delaware's choice of law rules regarding perfection and priority of UCC security interests apply to the claims of the Texas and Kansas Plaintiffs in these adversary proceedings.  This Court is not free to disregard Article 9's choice of law rules and engage in its own _ad hoc_ assessment of which states have the most significant contacts here.[11]

In resolving choice of law questions, Delaware courts apply the Restatement (Second) of the Law Conflict of Laws ("Restatement").  _Travelers Indem. Co. v. Lake_, 594 A.2d 38,

---

[11]     Moreover, as noted more fully below, the foregoing analysis of Delaware's choice of law rules is identical to the analysis the Court would undertake were it to apply Texas' choice of law rules.  This is because both Delaware and Texas (as well as Oklahoma) have each adopted choice of law statutes that are identical in all material respects: Article 9's standard choice of law provisions.  Thus, the same choice of law rules would apply regardless of the venue.

46-47 (Del. 1991); <u>Oliver B. Cannon & Son, Inc. v. Dorr-Oliver,</u>
<u>Inc.</u>, 394 A.2d 1160, 1166 (Del. 1978).  Under the Restatement, a
court "will follow a statutory directive of its own state on
choice of law."  Restatement § 6(1).  As the Comment to this
Restatement section states, "[t]he court must apply a local
statutory provision directed to choice of law provided that it
would be constitutional to do so.  An example of a statute
directed to choice of law is the Uniform Commercial Code which
provides in certain instances for ... the application of the law
of a particular state."  Section 9-301 of the Delaware UCC, Del.
Code Ann. tit. 6, § 9-301 (Delaware § 9-301), titled "Law
governing perfection and priority of security interests," is
precisely such a statutory directive.  Delaware § 9-301 governs
choice of law determinations with respect to non-uniform
amendments to the UCC regarding the perfection and priority of
security interests, such as Texas § 9.343.  Delaware § 9-301 must
be applied as written.

There is no merit to the contention of the Texas Producers
that Delaware § 9-301 does not apply here.  Citing § 9-109(a)(1)
of the Delaware UCC, they have asserted that Delaware's UCC,
including § 9-301, is inapplicable because the "purchase money
security interests" they claim are created by statute, much like
statutory liens, and are not Article 9 UCC security interests
that arise "by contract."  (Tex. Pls. Opp. Br. ¶¶ 12, 13).

42

Texas § 9.343 makes clear that it creates a security
interest that can arise only by contract and that is within the
scope of both Texas' and Delaware's version of Article 9.[12]
Plaintiffs rely on subsection (a) of Texas § 9.343, which creates
"a security interest in favor of interest owners, as secured
parties, to secure the obligations of the first purchase of oil
and gas production as debtor to pay the purchase price."  But the
statute specifically provides that an "authenticated record
giving the interest owner a right under real property law
operates as a security agreement created under this chapter."
See Texas § 9.343(a).  As the court stated in In re Enron North
America Corp., 312 B.R. 27 (S.D.N.Y. 2004), a case upon which the
Texas Producers rely, Texas § 9.343 "was designed to 'mirror[]
the creation of a consensual security interest by deeming that
certain standard conveyancing and marketing instruments fulfill
the documentation requirements imposed by article 9 [of the
UCC].'"  Id. at 31 (quoting In re Enron Corp., 302 B.R. 455, 459
(Bankr. S.D.N.Y. 2003)).  See also Tex. Bus. & Com. Code § 9.343
official cmt. ¶ 4 (recognizing security interests created by

---

[12]    Both Texas and Delaware have adopted the exact same
language regarding the scope of their respective versions of
Article 9 in all respects material to this dispute.  Accordingly,
in order for the Texas Producers' security interest to be outside
the scope of Delaware's version of Article 9, it would also have
to be outside the scope of Texas' version of Article 9.  The
Texas Legislature clearly did not intend for this to be the case,
given that Texas Article 9 governs Texas § 9.343 to the extent it
is not displaced by the statute.

Texas § 9.343 as "consensual security interests").  Therefore, this Court concludes that Texas Producers claim consensual security interests that arise by contract, not statutory liens or similar statutory interests, and considers the choice of law issue in this context.

The Texas Producers argue that, even if their security interests are within its scope, the Delaware UCC defers to a statute such as Texas § 9.343 in two separate instances.  The first such instance is Delaware § 9-109(c)(3), which provides that Delaware's version of Article 9 does not apply to the extent that "a statute of another State, a foreign country, or a governmental unit of another State or a foreign country, other than a statute generally applicable to security interests, expressly governs creation, perfection, priority, or enforcement of a security interest created by the State, country, or governmental unit."  6 Del. C. § 9-109(c)(3).  It is well-settled, however, that this languages only addresses governmental debtors.  See id. at § 9-109(c)(3) official cmt. ¶ 9.  Thus, it is inapplicable to this case.

The second instance is no more persuasive.  The Texas Producers cite Official Comment 7 to Delaware § 9-320.  This Comment states, in the context of a discussion of Delaware § 9-320(d), that:

    Under subsection (d), a buyer in ordinary

44

course of business of minerals at the
wellhead or minehead or after extraction
takes free of a security interest created by
the seller.  Specifically, it provides that
qualified buyers take free not only of
Article 9 security interests but also of
interests "arising out of an encumbrance."
...  This issue is significant only in a
minority of states.  Several of them have
adopted special statutes and nonuniform
amendments to Article 9 to provide special
protections to mineral owners, whose
interests often are highly fractionalized in
the case of oil and gas.  <u>See</u> Terry I. Cross,
<u>Oil and Gas Product Liens--Statutory Security
Interests for Producers and Royalty Owners
Under the Statutes of Kansas, New Mexico,
Oklahoma, Texas and Wyoming</u>, 50 Consumer Fin.
L. Q. Rep. 418 (1996).  <u>Inasmuch as a
complete resolution of the issue would
require the addition of complex provisions to
this Article, and there are good reasons to
believe that a uniform solution would not be
feasible, this Article leaves its resolution
to other legislation.</u>

<u>Id.</u> at § 9-320(d) official cmt. ¶ 7 (emphasis added).

The Texas Producers argue that the language emphasized above indicates that the Delaware UCC defers to these nonuniform UCC provisions governing oil and gas production.  Putting aside the fact that this language is from an Official Comment, and not from statutory text, the Court holds otherwise.  Stating that a "uniform solution" to such oil and gas interests "would not be feasible" and is therefore left to "other legislation" does not mean that Delaware law defers to such "other legislation."  Rather, this language, which was adopted from model Article 9,

merely recognizes that some states will enact non-uniform UCC amendments on the subject governed by Delaware § 9-320(d).  The Court's interpretation of Comment 7 is further supported by the fact that the Comment does not accompany one of Delaware's choice of law provisions, but rather a provision governing the extinguishment of security interests in oil and gas by a buyer in the ordinary course.

Finally, the Court also rejects the Texas Producers' argument that Delaware's choice of law rules should not apply here on the grounds that it is mere "happenstance" that this proceeding is in Delaware.  (Tex. Pls. Opp. Br. at  2).  Because Debtor SemCrude is a Delaware entity, venue in this Court is proper.  See 28 U.S.C. § 1408.  Debtors Eaglwing and SemGas are organized under the laws of Oklahoma, and all three Debtors have their principal places of business in Oklahoma.

In any event, regardless of where this bankruptcy was filed, the same Article 9 conflict rules that Delaware applies would govern because, as noted above, Delaware and Oklahoma (as well as Texas) have each adopted § 9-301 of the UCC.  See Okla. Stat. tit. 12A, § 1-9-301; Tex. Bus. & Com. Code § 9.301.  At bottom, application of these principles – uniform in each state in question – would yield the same result irrespective of whether this Court was sitting in Delaware, Oklahoma or Texas.

Obviously, this is not by accident.  Enforcement of these

46

choice of law rules here furthers a "primary goal" of the UCC, i.e., "'to promot[e] certainty and predictability in commercial transactions.'"  <u>Shell Oil v. HRN, Inc.</u>, 144 S.W.3d 429, 435 (Tex. 2004) (quoting <u>Am. Airlines Employees Fed. Credit Union v. Martin</u>, 29 S.W.3d 86, 92 (Tex. 2000)).  "One of the principal purposes of the 2001 changes in Article 9 of the UCC was to require that all UCC security interest filings for a given corporation be made in the corporation's state of incorporation." <u>In re Aura Systems, Inc.</u>, 347 B.R. 720, 724 (Bankr. C.D. Cal. 2006).

Original Article 9 provided that the state where collateral was located was usually the proper location for perfecting a security interest.  <u>See</u> UCC 9-301 official cmt. ¶ 4.  This law was unsatisfactory to the American Law Institute (ALI) and the Uniform Law Commission of The National Conference of Commissioners on Uniform State Laws (NCCUSL), the entities responsible for the drafting of Revised Article 9, for two reasons.  <u>See</u> <u>id.</u>  First, lenders seeking a security interest in a corporation's collateral would have to examine the filings in all states where the corporation had collateral to make sure that there was no outstanding encumbrance in such collateral, and they were required to file financing statements in every state where such collateral was located.  <u>See</u> <u>id.</u>  This process was deemed overly burdensome on commerce, and consequently Revised Article 9

47

"reduces the number of filing offices in which secured parties must file or search when collateral is located in several jurisdictions."  <u>Id.</u>

Second, personal property is frequently moved from state to state.  Under original Article 9, "a secured creditor could lose its security interest if it did not adequately keep track of the location of its collateral and take appropriate subsequent steps, within an appropriate time frame, to maintain its secured status by filing in the new state or states where the collateral came to rest."  <u>Aura Systems</u>, 347 B.R. at 724 (citing UCC § 9-103 (1972) (amended effective July 1, 2001)).  "In addition, a secured creditor would have to investigate the provenance of collateral to find out if it was subject to a prior perfected security interest in another state."  <u>Id.</u>

As has been noted elsewhere, "[t]he goal of the 2001 amendments here at issue was to make a UCC security interest filing permanent and easy to find."  <u>Id.</u>  This is in keeping with the longstanding goal of Article 9 "to create a simple and clear notice filing system."  <u>First Agri Serv., Inc. v. Kahl, et al.</u>, 385 N.W.2d 191, 196 n.9 (Wis. Ct. App. 1986).  For an Oklahoma corporation, for instance, a potential creditor now can simply examine the UCC filings in Oklahoma to determine whether there is a financing statement covering any collateral belonging to the

corporation anywhere in the United States.[13]  Ignoring Article
9's choice of law rules would not only compromise this system and
unravel a national, notice-filing system, but also would ignore
the enactment of UCC 9-301 by each state legislature that is in
any way even remotely involved in this adversary proceeding.

Thus, this Court will apply Delaware § 9-301 to determine
which states' substantive laws govern perfection and priority of
the security interests claimed by the Texas Producers.  The
general rule of Delaware (and Texas and Oklahoma) § 9-301 is that
the location of the debtor governs perfection.  Del. Code Ann.
tit. 6, § 9-301(1).  As Official Comment 4 to Delaware § 9-301
states, "the law governing perfection of security interests ...
is the law of the jurisdiction of the debtor's location, as
determined under Section 9-307."  Section 9-307(e) provides that
the location of a registered organization is the state in which
the entity was organized.  Thus, the locations of SemCrude,
Eaglwing and SemGas are Delaware, Oklahoma and Oklahoma,
respectively.  None of these three Debtors is "located" in Texas.

Under Delaware § 9-301, the law of the location of the
relevant Debtor governs perfection of the Texas Producers'
claimed security interests to the extent that, as of the Petition
Date, that Debtor had possession of the oil and gas originating

---

[13]     Subject to narrow exceptions for property more closely
affiliated with real property than normal personal property, such
as fixture filings.

49

from the Texas Producers or proceeds thereof in the form of exchanged oil or gas.  The law of the location of the relevant Debtor also governs perfection of proceeds of the Texas oil and gas held in the form of accounts receivable as of the Petition Date.  See id. at § 9-301 official cmt. ¶ 3, Example 1.

Under Delaware § 9-301, the only relevant exception to the general rule that the law of the location of the Debtor governs perfection, is Delaware § 9-304(a).  That section provides, with respect to cash proceeds of the Texas oil and gas held by the Debtors in bank accounts as of the Petition Date, that "[t]he local law of [the] bank's jurisdiction governs perfection."  A "bank's jurisdiction for purposes of this" provision means, in general, the law that the bank and the debtor or customer agreed would apply or, if there is no such agreement, the law of the place where the office in which the account is located.  Id. at § 9-304(b).  Schedules filed by the Debtors in these cases show that their cash, as of the Petition Date, was held in a bank located in Oklahoma.  (Eaglwing, L.P. First Amended Schedules/Statements, Sch. B [Case No. 08-11525, Docket No. 1927]; SemCrude, L.P. First Amended Schedules/Statements, Sch. B [Case No. 08-11525, Docket No. 1926]; SemGas, L.P. First Amended Schedules/Statements, Sch. B [Case No. 08-11525, Docket No. 1936]).  Therefore, the perfection of security interests in cash proceeds of Texas oil and gas is governed by Oklahoma law, not

50

Texas law.[14]

Therefore, Texas § 9.343 does not apply in deciding whether the Texas Producers' claimed security interests were perfected. Rather, Delaware law or Oklahoma law govern perfection.  Under either Delaware law, Del. Code Ann. tit. 6, § 9-310(a), or Oklahoma law, Okla. Stat. tit. 12A, § 1-9-310(a), the Producers would have had to file UCC financing statements in those states to perfect their security interests in the Texas Product and the proceeds thereof.  Thus, the Court concludes that unless the Texas Producers can show in Phase II of this litigation that they have properly filed financing statements in Delaware or Oklahoma, as applicable, they do not have perfected security interests in the Texas Product, or the proceeds thereof.

b. <u>Governing law of priority</u>

Assuming, arguendo, that the Texas Producers properly filed UCC financing statements with respect to the Texas Product and proceeds thereof prior to the Petition Date, the law governing the priority of the Texas Producers' claimed security interests relative to competing Article 9 security interests would also be determined by Delaware § 9-301.

Pursuant to Delaware § 9-301, priority is decided under the

---

[14]    No party has asserted that there is an agreement between the Bank of Oklahoma and the Debtors that calls for the application of any law other than Oklahoma.

law of the Debtor's location unless one of the exceptions
enumerated in § 9-301 applies.  Here, as set forth below, the
Texas Producers' alleged security interests in Texas Product and
proceeds thereof in the form of exchanged oil and gas and cash
are all exceptions to the general rule.  Only the priority of the
Texas Producers' claimed security interest in proceeds of the
Texas Product held by Debtors in the form of accounts receivable
as of the Petition Date is determined under the law of the
Debtor's location, be it Delaware or Oklahoma.

One applicable exception to the general rule of Delaware §
9-301 is set forth in § 9-301(3)(C), which provides that "while
... goods ... [are] located in a jurisdiction, the local law of
that jurisdiction governs ... the priority of a nonpossessory
security interest in the collateral."  Under this exception, to
the extent that the Debtors held, as of the Petition Date, Texas
Product or exchanged oil or gas proceeds, the law of the state in
which the collateral was located as of the Petition Date would
determine the priority of the Texas Producers' claimed security
interests.

The other relevant exception concerning priority is Delaware
§ 9-304, which prescribes the "[l]aw governing perfection and
priority of security interests in deposit accounts."  Under
Delaware § 9-304, because the Debtors' bank accounts were located
in Oklahoma, Oklahoma law governs the priority of the Texas

52

Producers' alleged security interests in cash proceeds held in Oklahoma deposit accounts as of the Petition Date.  Under Oklahoma law, "[c]onflicting perfected security interests ... rank according to priority in time of filing or perfection." Okla. Stat. tit. 12A, § 1-9-322(a)(1).

Thus, even if the Texas Producers had perfected security interests in the Texas oil and gas and the proceeds thereof, Texas law would govern only the priority of the Texas Producers' security interests in Texas oil and gas or proceeds thereof in the form of exchanged oil or gas held by the Debtors in Texas as of the Petition Date.

### 5. Analysis under governing law

Either Delaware or Oklahoma law will govern perfection of the Texas Producers' security interests provided by Texas § 9.343.  The fact that these security interests may be entitled to automatic perfection under Texas Law is not dispositive, because Texas law does not govern perfection of the Texas Producers' claims against the defendants in this adversary proceeding.  In order to be perfected under Delaware and Oklahoma law, the Texas Producers must have filed UCC-1 financing statements in those states, or perfected their security interest in another proper method under the state's respective versions of Article 9, such as by obtaining control over the Debtors' deposit accounts.

To the extent that the Texas Producers have failed to

perfect their security interests under Delaware and/or Oklahoma law, they are the holders of unperfected security interests, assuming they meet the other requirements set forth in Texas § 9.343.  As noted above, whether the law governing priority of security interests is that of Texas, Oklahoma, or Delaware, unperfected security interests are subordinate to properly perfected security interests, such as the one claimed by the Banks in this case.  Under Texas law, Texas § 9.322(a)(2) provides that "[a] perfected security interest or agricultural lien has priority over a conflicting unperfected security interest or agricultural lien."  As noted above, this same language also has been adopted in all other relevant states.

Accordingly, the Court holds that a security interest perfected only in Texas by virtue of the automatic perfection in Texas § 9.343 will be subordinate to a security interest that was duly perfected against the Debtors in the appropriate state. Consequently, the Texas Producers' motion for summary judgment is denied, and the Banks' motion for summary judgment is granted.[15]

## V.   <u>CERTIFICATION FOR DIRECT APPEAL</u>

As noted at the outset of this Opinion, the Court rules today on a true question of first impression.  At issue,

---

[15]     On account of its ruling regarding choice of law, the Court does not reach the constitutional and other challenges that the Banks and J. Aron have asserted against Texas § 9.343.

ultimately, is a sum of not less than $57 million.  The Court has little doubt that this decision will be appealed.

Recent amendments to title 28 of the United States Code afford this Court the option to certify a matter for direct appeal to the Circuit Court of Appeals, assuming certain criteria are met; the decision of whether to take the appeal rests, of course, with the Court of Appeals.  Direct appeals are governed by 28 U.S.C. § 158(d)(2), which provides, in relevant part, as follows:

> (2)(A)    The appropriate court of appeals shall have jurisdiction of appeals described in the first sentence of subsection (a) if the bankruptcy court, the district court, or the bankruptcy appellate panel involved, acting on its own motion or on the request of a party to the judgment, order, or decree described in such first sentence, or all of the appellants and appellees (if any) acting jointly, certify that –
>
> > (i)    the judgment, order or decree involves a question of law as to which there is no controlling decisions of the court of appeals for the circuit or of the Supreme Court of the United States, or involves a matter of public importance;
> >
> > (ii)    the judgment, order, or decree involves a question of law requiring resolution of conflicting decisions; or

> (iii)    an immediate appeal from the
>          judgment, order, or decree
>          may materially advance the
>          progress of the case or
>          proceeding in which the
>          appeal is taken; and if the
>          court of appeals authorizes
>          the direct appeal of the
>          judgment, order, or decree.

In the present case, the Court finds that the statutory criteria are met: there is no governing law on the issue before the Court, and it appears that prompt consideration of the appeal may serve to advance these bankruptcy proceedings.  This last point is especially true given that the Debtors have recently filed a plan of reorganization and have expressed an intention to seek confirmation of such plan and emerge from bankruptcy in September, 2009.  Accordingly, the Court deems it appropriate to certify this matter <u>sua sponte</u> for direct appeal to the United States Court of Appeals for the Third Circuit.

56

## VI. <u>CONCLUSION</u>

For the foregoing reasons, the Court finds that a security interest perfected only in Texas by virtue of the automatic perfection in Texas § 9.343 will be subordinate to a security interest that was duly perfected against the Debtors in the appropriate state. Accordingly, the Court will deny the Texas Producers' motion for summary judgment, and grant the Banks' motion for summary judgment.

An appropriate order follows.

By the Court,

_____

Dated: June 19, 2009              Brendan Linehan Shannon
                                  United States Bankruptcy Judge